# Equitable Life Assurance Society of United States v. Merlock.

(Decided Jan. 16, 1934.)

(As Modified on Denial of Rehearing March 20, 1934.)

WM. MARSHALL BULLITT, R. LEE BLACKWELL, and BRUCE & BULLITT and HOWARD & MAYO for appellant.

KIRK & WELLS and Z. WELLS for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

The determinate question is whether Isaac Merlock, on March 20, 1932, was "totally and permanently disabled by disease and will thereby presumably be continuously prevented for life from engaging in any occupation or performing any work for compensation of financial value," within the meaning of this phrase, as it is used in the policy of insurance here involved. Merlock was a coal miner for 25 or 30 years, working at the various types of work inside and outside of mines. On March 20, 1932, and for some time prior thereto, he was in the employment of the Inland Steel Corporation of Delaware, which was engaged in operating coal mines. E. R. Price was its superintendent at Wheelright. Its mine, at which Merlock was employed, did not operate regularly on account of conditions of the coal industry. According to the records of the corporation, during the month of November, 1931, the mine operated 21 days. During that time Merlock worked 19 days. His earnings were $79.40. During the month of December, 1931, the mine operated 7 days; Merlock worked 11 days (inside and outside); his earnings for that period were $39.63. In the month of January, 1932, the mine did not operate. Merlock, however, worked for the company 9 days, and earned $27.36. In the month of February, 1932, the mine operated one day; Merlock worked 4 days and earned $11.68. In the month of March, 1932, until the day Merlock left the employment of the company, the mine operated 7 days; Merlock worked 7 days, and earned $17.10.

During these months Merlock "loaded 14 or 15 tons a day." G. C. Sutherland worked with Merlock. He says that Merlock was "a good workman," and "all the

men wanted to work with him." He saw him load "trucks, unload slate out of the mine, and move heavy timber." "He was a leader of the gang." John Hendrick was a brakeman at the Inland Steel Corporation's mine. His duty was "to pass up the motors." He was a brakeman where Merlock did his loading and saw Merlock load 12 to 14 tons a day.

The general condition of business became such that it was deemed proper by the Inland Steel Corporation to reduce the number of its employees. In doing so, it undertook to retain all married men and those with dependents. On March 20, 1932, in accordance with this policy, it laid off about 60 or 70 men, leaving possibly one or two single men (who were supporting a mother or a sister). Merlock was unmarried, with no dependents. Of the number discharged he was included. While engaged in his work the heart trouble, of which he now complains, was not apparent to the inmates of the home at which he boarded, nor to his fellow servants. It was the custom of the Inland Steel Corporation to have its employees undergo a physical examination at stated periods. Dr. John Bailey, residing at Wheelright, was its physician who conducted such examinations. On November 6, 1931, while engaged in making regular physical examinations of its employees, he examined Merlock, and observed that he was a man "of good physique, around 40 years old, well nourished, and normal in every respect, except he had a murmur in the aorta valve, which could be heard in the region of the heart," but "it was not a condition that would prevent him loading coal or doing work around the mine," nor "impair his efficiency or ability to engage in such work." In November he administered to him the Wasserman test, which showed four plus. Contrariwise, Merlock testifies that after he was examined by the corporation's doctor he was "cut off of the payroll" and given the information that he was not to get "another shift in the mines" on account of his heart. He claims that his heart had been giving him trouble for 2 or 3 months before he quit work and that the affected condition of his heart during that time was about the same as it was at the time he testified herein. To support his testimony, he introduced Drs. Pickelsimer, Wells, and Castle, They examined him on April 5, 1932. They agree that their examination disclosed a diseased heart. "somewhat enlarged, with murmurs in at least three valves

(called leaking heart), blood gushing back in the heart''; that owing to the condition of his heart ''it beat faster,'' caused ''smothering spells,'' and ''temporary heart failure''; i. e., ''the heart would dilate and fall.'' It was their judgment he was unable to do any kind of work and death might result even ''by climbing stairs''; that his heart disease was permanent. Dr. Stephens and Dr. Bailey examined him after April 5, 1932. Dr. Stephens details his examination in this language:

''Briefly the patient was fairly well developed, well nourished, weighed 138 pounds, eyes normal, never complained of his eyes, teeth all right, except a few fillings, no teeth abscessed or connected with any pus or any teeth that threw off any poisons, tonsils normal, so was his throat. The examination of the abdomen was negative, no masses or tumors nor hernia or rupture. Nothing there to indicate a diseased condition, but he did have a diseased heart. He had what is called diseased aorta, or murmur, and a leak in the tricuspid valve of the heart. This murmur was moderately well divided, could be plainly heard in the pulmonary area, the middle part of the chest. The murmur was not discernible under his arms, or that portion of the chest, no swelling indicated, no decomposition. He had some slight enlargement of the heart. * * * I am positive he has leakage of the heart, no swelling of the feet or legs, his carriage, gait and posture seemed normal as far as I could tell.''

It was the opinion of Drs. Bailey and Stephens there was nothing in the condition of Merlock's heart that would necessarily or unreasonably disable him when engaging in normal labor or physical exertion.

The record of Merlock's work, the amount paid him therefor, the testimony of his fellow workmen, and his conduct in returning and seeking employment of the Inland Steel Corporation after his discharge in March, corroborate Drs. Bailey and Stephens.

The policy expressly provides that the insurance under it shall automatically cease ''upon termination of the employee's employment with The Inland Steel Corporation in the classes of employees insured thereunder without regard to the cause of such termination.'' It contains this clause:

''In the event that any employee while insured

under this policy and before attaining the age of 60 becomes totally and permanently disabled by bodily injury or disease and will thereby presumably be continuously prevented for life from engaging in any occupation or performing any work for compensation of financial value, upon receipt of due proof of such disability before the expiration of one year from the date of its commencement, the Society will, in termination of all insurance of such employee under this policy, pay equal monthly Disability Installments, the number and amount of which shall be determined by the Table of Installments below; the number of installments being that corresponding to the nearest amount of each installment shall be adjusted in the proportion that the amount of insurance on such employee's life bears to the amount used in the table in fixing the number of installments. The amount of insurance herein referred to shall be that in force upon the date on which said Total and Permanent Disability commenced.''

The fact Merlock, with 60 or 70 other employees, was discharged on March 20, 1932, and the reasons therefor, are neither denied nor disputed by any evidence in his behalf except inferentially. He does not deny categorically the testimony of his fellow employees or of the records of the company, showing the quantity and quality of work he actually performed prior to March 20, 1932. The decisive question is, not whether Merlock had disease of the heart, but whether at, and prior to, the time he was discharged on March 20, 1932, he was ''totally and permanently disabled by disease and will thereby presumably be continuously prevented for life from engaging in any work of financial value.'' It was incumbent upon him to establish by competent and relevant evidence that he was totally and permanently disabled by heart disease and the disease commenced before his discharge, and will, presumably, continuously prevent him for life from engaging in any occupation or perform any work for compensation of financial value. Ohio National Life Ins. Co. v. Stagner, 231 Ky. 275, 21 S. W. (2d) 289; Doyle v. New Jersey Fid. & Plate Glass Ins. Co., 168 Ky. 789, 182 S. W. 944, Ann. Cas. 1917D, 851; Travelers' Ins. Co. v. Turner, 239 Ky. 191, 39 S. W. (2d) 216, 217; John Hancock Mutual Life Ins. Co. v. Cave, 240 Ky. 56, 40 S. W. (2d) 1004,

79 A. L. R. 848; Henderson v. Continental Cas. Co., 239 Ky. 93, 39 S. W. (2d) 209.

The language of the court in Travelers' Ins. Co. v. Turner is strikingly pertinent, wherein it is said:

"In order to determine what merit there may be in this contention, it will be necessary only to consider the evidence for the appellee, and, if his evidence tended to establish that he was totally disabled while in the employ of the Louisville Milling Company, he was entitled to have his case submitted to the jury, though the evidence for the appellant tended to contradict that for the appellee. In such state of case it would of course be for the jury to say what were the facts from the contradictory evidence adduced. The question of what is total disability within the meaning of such a phrase in a life insurance policy must be considered from two angles which may be designated as those of quantity and quality. To what extent must an assured be disabled from doing anything before he can be called totally disabled? This is the angle of quantity. What line or lines of work must he be unable to perform to come within the terms of his policy? This is the angle of quality. In the instant case we have only the question of quantity. The decisions of our court bearing upon this proposition were reviewed and considered by this court in the case of Provident Life & Accident Ins. Co. v. Harris, 234 Ky. 358, 28 S. W. (2d) 40. In that case we pointed out how this jurisdiction had adopted the liberal construction doctrine which is to the effect that total disability does not mean absolute helplessness or entire physical disability, but rather an inability to do substantially or practically all material acts in the transaction of the insured's business in his customary and usual manner. In that case we pointed out that the insured was doing himself, although helped at times, all the duties incumbent upon him, and because of that we held that he was not entitled to recover under his policy for total disability. The cases of Doyle v. New Jersey Fidelity & Plate Glass Ins. Co., 168 Ky. 789, 182 S. W. 944, Ann. Cas. 1917D, 851, and Ohio National Life Ins. Co. v. Stagner, 231 Ky. 275, 21 S. W. (2d) 289, were cited. In the Doyle Case, because the insured did do substantially all the work he was ac-

customed to do before his accident, he was denied recovery, but in the Stagner Case he was allowed to recover because, although he was able at time to do fitfully some things he was substantially and practically unable to do all the material acts in the transaction of his business. To the same effect are Hagman v. Equitable Life Assurance Soc. of U. S., 214 Ky. 56, 282 S. W. 1112; Continental Casualty Co. v. Linn, 226 Ky. 328, 10 S. W. (2d) 1079, and National Life Ins. Co. v. O'Brien's Ex'x, 155 Ky. 498, 159 S. W. 1134.''

The testimony in behalf of Merlock and of the insurance company is adequate to support a verdict in favor of either of them. The jury accepted that in favor of Merlock. When the case is viewed in the light of the provisions of the policy, the principles, supra, and the conflicting evidence adduced, it is not doubtful it was properly submitted to the jury.

It is argued "there was no evidence that Merlock had become totally and permanently disabled, within the provisions of the policy, before the termination of his employment on March 20th, 1932." This argument overlooks the testimony of Merlock to the effect that he was afflicted with the heart trouble before he ceased to work, as it is described by the physicians who examined him on the 5th of April, 1932; also, the fact the condition of his disease on April 5, 1932, as it is described by these physicians, could not have originated between March 20th and April 5th, and reached the degree of seriousness, in which they found it, on the latter date.

The argument that the pleadings do not support the judgment is again presented, with the usual contention that Merlock's cause of action is based upon the certificate of insurance, and not upon the group policy. We considered this question in Equitable Life Assurance Soc. of U. S. v. Branham, 250 Ky. 472, 63 S. W. (2d) 498, 499; John Hancock Mutual Life Ins. Co. v. Cave, supra; and also Ætna Life Ins. Co. v. Daniel, 251 Ky. 760, 65 S. W. (2d) 1025, decided Dec. 12th, 1933. As was said in the Branham Case, "the insurance company, without objection filed its answer." "Failure of the appellant to present in the trial court its objections to he several actions being based on the certificates instead of the policy and its answer setting forth the policy, and the filing of the same, were a waiver of the objections here and now presented.''

These cases are conclusive of the insurance company's objection to the action being based on the certificate of insurance.

The argument is pressed "that the court erred in permitting the jury to find a verdict and in entering a judgment thereon, for an amount, which included disability benefits [No. 1] which might fall due in the future, depending upon whether or not Merlock's alleged total and presumably permanent disability continued, and [No. 2] which even if such disability did continue, might be owing or not to Merlock, but to his beneficiary." In Equitable Life Assurance Soc. of U. S. v. Branham, supra; Travelers' Ins. Co. v. Turner, 239 Ky. 191, 39 S. W. (2d) 216, 218, and in Prudential Ins. Co. of America v. Hampton, 252 Ky. 145, 65 S. W. (2d) 980, decided November 3, 1933, the like argument was made, to override a judgment in the same language of that in the present one. The determination of this question in those cases should now be regarded as final, and this form of judgment, in such cases, is no longer subject to controversy, in this jurisdiction.

Again we have presented the argument that the words of the policy, i. e., "prevented for life from ento the several actoins being based on the certificates ingaging in any occupation or performing work for compensation of financial value," "mean that the insured must be prevented by disability from engaging in any gainful occupation, for which he is fitted by his training, skill, actual ability or experience, rather than his regular occupation or business." The trial court in its instructions properly adopted and followed the definition of the words "total disability', as they were defined by this court in Travelers' Ins. Co. v. Turner, supra; Hagman v. Equitable Life Assur. Soc. of United States, 214 Ky. 56, 282 S. W. 1112; Equitable Life Assurance Soc. v. Fannin, 245 Ky. 474, 53 S. W. (2d) 703; Henderson v. Continental Cas. Co., supra; Columbia Cas. Co. v. McHargue, 246 Ky. 93, 54 S. W. (2d) 617; National Life & Acc. Ins. Co. v. Bradley, 245 Ky. 311, 53 S. W. (2d) 701; Ætna Life Ins. Co. v. Wyant, 249 Ky. 562, 61 S. W. (2d) 50; National Life & Acc. Ins. Co. v. O'Brien's Ex'x, 155 Ky. 498, 159 S. W. 1134; Benefit Ass'n of Ry. Employees v. Secrest, 239 Ky. 400, 39 S. W. (2d) 682; Equitable Life Assurance Soc. of U. S. v. Branham, supra. The pronouncement in those cases of this court's definition of the term "total dis-

ability'' ought to be, and is, sufficient to class it as ''well settled'' by this court. The sole object of the parties to the insurance contract here involved was that the employees of the Inland Steel Corporation, as such, were to be protected by the policy and the certificate of insurance issued in accordance therewith, only so long as they continued in the services of the Inland Steel Corporation. The policy insured Merlock as a coal miner, while working at the various types of work inside and outside of the mine of the Inland Steel Corporation. It only protected him as an employee while engaged in the various types of work of a coal miner as an employee of the Inland Steel Corporation. The disability which he was insured against was one that would render him unable to follow his usual occupation in the performance of any of the various types of work inside and outside of the mine of the Inland Steel Corporation, although he might be able to do something else. Hence, it follows that if he was unable to follow his occupation as a coal miner, because of disease of the heart, it was ''total disability,'' within the meaning of the policy. See cases supra. As was said by this court in Equitable Life Assurance Soc. of U. S. v. Branham, ''the policies in these cases clearly were an insurance against such presumbly total disability as might prevent the insured from following their regular occupations in which they were engaged at the time of their respective injuries, and none other.''

The Equitable Life Assurance Society, utilizing Ætna Life Insurance Co. v. McCullagh, 191 Ky. 226, 229 S. W. 1033, as a premise, urgently insists that later opinions of this court have erroneously disregarded the correct definition of the term ''total disability.'' In Ætna Life Insurance Co. v. McCullagh, and in others following it, the policy provided for partial as well as total disability. In the present case the policy provides solely for total disability. Hence, the case of Ætna Life Ins. Co. v. McCullagh, and like cases, are not authority in the present one, nor do they conflict therewith.

Drs. Bailey and Stephens examined Merlock after April 5th, and while they agree with the physicians who examined him on April 5th that Merlock was afflicted with diseased heart, they gave it as their opinion that by proper treatment without much risk to him, the primary cause of the disease can be removed, and the impairment of the heart thereby arrested to a degree that

he will be enabled to perform the labor of an average man of his natural, normal, physical strength. It is a rule of general application that where a plaintiff sustains damage by reason of an injury or disease, it is his duty to minimize his damage. H. T. Whitson Lbr. Co. v. Upchurch, 198 Ky. 127, 248 S. W. 243; Gaffney v. Switow, 211 Ky. 232, 277 S. W. 453. And if his injury or disease may be corrected by treatment or thereby materially decreased, it is his duty to exercise ordinary care in an effort to effect a cure or to relieve himself. His failure so to do precludes or mitigates his damage, according to the facts in the particular case.

Without deciding the applicability of this principle to contracts of insurance, will say, in the pending case no pleading presented such defense. The court in every case should instruct the jury only on the issues presented by pleadings which are supported by the evidence. Conceding, without deciding, however, that the testimony of Drs. Bailey and Stephens in this respect was admissible under the general issue, no instruction was offered or requested by the company on this theory. The omission from the instructions of a qualification based on this testimony of Drs. Bailey and Stephens was not an error.

Perceiving no error prejudicial to the substantial rights of the insurance company, the judgment is affirmed.